COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| CHARLES ANDREW APPLEWHITE, | § | No. 08-11-00121-CR |
| Appellant, | § | Appeal from |
| v. | § | 432nd District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC # 1102795D) |

**O P I N I O N**

Charles Andrew Applewhite appeals his convictions of aggravated sexual assault of a child (Count I, II, III, and VI) and indecency with a child by contact (Counts IV and V). We affirm.

**FACTUAL SUMMARY**

Forty-three-year-old Tamera has three children, Chip Tire[1], Michael, and Charity. Tamera and her former husband, Richard, both have cerebral palsy. Appellant worked in Tamera's home while she and Richard were married and he sometimes spent the night with them. On those occasions when he stayed overnight, Appellant slept in Chip's room. After Tamera and Richard divorced, she and the children began living with Appellant. The children usually slept in the same bedroom with her but Chip sometimes slept in Appellant's bedroom. Chip, who was nineteen-years-old at the time of trial, testified that he had a "rocky" relationship with his father when he was a child. His father, who uses a motorized wheelchair, would run

---

[1] The victim is identified in the indictment by a pseudonym. *See* TEX.CODE CRIM.PROC.ANN. art. 57.01 (West 2006). In order to maintain the victim's confidentiality, the opinion refers to all of the family members by only their first names.

into him and sometimes grab him by the hair and drag him alongside the wheelchair. When Chip was eight or nine-years-old, Appellant began working as a home healthcare worker for Tamera and Richard. Chip would sometimes stay overnight at Appellant's house and he began seeing him as a father figure because of the way Appellant treated him. Unlike Richard who often yelled at Chip, Appellant spoke calmly and listened to him like a loving father. Chip went so far as to refer to Appellant as "Dad." At first, Chip slept on the couch but he eventually began sleeping in Appellant's bedroom. Appellant also stayed overnight at Chip's house and slept in his bedroom. Appellant kissed Chip and touched him sexually on many occasions. He specifically recalled one incident of anal intercourse when Appellant demanded that Chip put his penis in Appellant's anus. It stopped abruptly because Richard knocked on the door and came into the bedroom. Appellant often put his penis in Chip's mouth to the point that Chip described it as "nonstop." Chip also recalled Appellant inserting his penis in Chip's anus on a few occasions. Chip did not try to stop the assaults nor did he tell anyone because Appellant made him feel that it was acceptable behavior and he told Chip that he would do it if he loved him.

Chip's grandmother, Shannon, suspected that Appellant was sexually abusing Chip and made a report to CPS. Appellant told Chip that Shannon was evil and was trying to break up the family. He also told Chip that CPS would take him and put him in a terrible place. CPS interviewed Chip several times and he consistently denied the sexual abuse. The children were removed from Appellant's home when Chip was fourteen and the abuse stopped. During his freshman year of high school, Chip finally told his grandmother that he had been abused. They did not make a police report until they learned that Chip's younger brother, Michael, was visiting Appellant.

Thirteen-year-old Michael testified at trial. He recalled that his family began living with

Appellant when he was six or seven years old and Michael shared a room with his mother and sister. Chip slept in Appellant's bedroom which only had one bed. Michael slept in Appellant's bedroom on three nights and he saw Appellant and Chip sleeping in the same bed. Michael slept on the floor. On one of those nights, he saw Chip lying on his stomach with Appellant partially on top of and behind him. Michael saw that Appellant's hips were moving back and forth under the sheets but Michael did not understand what he was seeing. On another night, Michael saw Appellant on his back with his legs spread apart under the sheets and Chip was under the sheets with his head near Appellant's penis. Chip's head was moving up and down and Appellant had his hands on Chip's back. Michael knew this behavior was abnormal and he never slept in that bedroom again. He never told anyone what he had seen because he was too scared.

### EXTRANEOUS OFFENSE

In his first issue, Appellant argues that the trial court abused its discretion by admitting an extraneous offense. The State responds that the evidence was admissible to rebut the defensive theory of fabrication. Alternatively, the State argues that admission of the evidence is harmless.

The trial court overruled Appellant's objections based on Texas Rules of Evidence 403 and 404(b) and permitted Chip to testify that he saw Appellant molest another boy, Tony White, to whom Appellant referred as his "play grandson." Chip believed that Tony was about twelve years of age. On one occasion when Tony was at Appellant's house, Chip looked in the bedroom and watched Tony performing anal sex on Appellant. The defense later called Tony as a witness and he denied that Appellant had ever engaged in any type of inappropriate or sexual contact with him.

*Relevant Law and Standard of Review*

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a

person to show action in conformity therewith. TEX.R.EVID. 404(b). But it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, or knowledge. *Id.* Rebuttal of a defensive theory is one of the "other purposes" for which extraneous offense evidence may be admitted under Rule 404(b). *Williams v. State*, 301 S.W.3d 675, 687 (Tex.Crim.App. 2009); *Dennis v. State*, 178 S.W.3d 172, 180 (Tex.App.--Houston [1st Dist.] 2005, pet. ref'd). This includes rebutting the defensive theory that the complainant fabricated the allegations against the defendant. *See Bass v. State*, 270 S.W.3d 557, 563 (Tex.Crim.App. 2008); *Dennis*, 178 S.W.3d at 180-81. The Court of Criminal Appeals explained in *Bass* that if the State can show that a defendant has committed similar sexual assaults against unrelated and unconnected children, an affirmative defense allegation that the complainant fabricated his claims is less likely to be true. *Bass*, 270 S.W.3d at 562-63. By showing that the complainant's allegations are less likely to be fabricated, the evidence directly rebuts the defensive claims and has logical relevance aside from character conformity. *Id.*

We review the trial court's admission of extraneous offense evidence for an abuse of discretion. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex.Crim.App. 2009); *Prible v. State*, 175 S.W.3d 724, 731 (Tex.Crim.App. 2005). If the trial court's ruling is within the zone of reasonable disagreement, there is no abuse of discretion. *Prible*, 175 S.W.3d at 731. A trial court's ruling on the admissibility of an extraneous offense is generally within this zone if the evidence shows that (1) an extraneous transaction is relevant to a material, non-propensity issue, and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. *De La Paz*, 279 S.W.3d at 344.

*Rebuttal of a Defensive Theory*

In his cross-examination of Chip, Appellant's attorney elicited testimony that when Chip was interviewed by the CPS caseworkers in 2000, 2002, 2003, and 2004, he had on every occasion denied any inappropriate touching or sexual contact by Appellant. Counsel also questioned Chip about his grandmother's dislike of Appellant and her repeatedly asking Chip whether he had been molested by Appellant. This line of questioning raised the defensive theory that Chip had fabricated the allegations against Appellant in response to his grandmother's influence. In theory, evidence that Appellant had sexually assaulted another child could make less probable Appellant's claim that Chip fabricated the allegations, and thus, would have relevance other than character conformity. In this case, however, Chip provided the only testimony that the extraneous offense occurred as Tony denied ever having any sexual contact with Appellant. The question is whether Chip's uncorroborated testimony that Appellant committed an extraneous offense against another child is logically relevant to make it less likely to be true that Chip fabricated the allegations against Appellant. Relying on *Pavlacka v. State*, 892 S.W.2d 897 (Tex.Crim.App. 1994), Appellant contends that Chip's testimony about the extraneous offense is not relevant to any issue other than character conformity.

In *Pavlacka*, the defense did not assert that the complainant fabricated the allegations in response to an improper influence or motive but the credibility of the complainant was impeached with a prior inconsistent statement. *Id.* at 899-01. In response to the impeachment, the State elicited testimony from the complainant that the defendant had molested him on an occasion other than the one charged in the indictment. *Id.* at 900-01. The State argued the extraneous offense evidence was admissible to "shore up" the credibility of the complainant. *Id.* at 899. The First Court of Appeals held that the evidence was relevant to rebut a defensive theory of fabrication. *Pavlacka v. State*, 848 S.W.2d 325, 327 (Tex.App.--Houston [1st Dist.]

1993).  The Court of Criminal Appeals reversed, holding that the defendant did not raise the defense of fabrication and the extraneous offense evidence was not relevant to rehabilitate the child's credibility with respect to the charged offense.  *Pavlacka*, 892 S.W.2d at 901-03.  With respect to the latter holding, the Court stated that "testimony of other molestations coming from an impeached complainant cannot logically serve to rehabilitate that complainant."  *Id.* at 903.  The Court further explained:

> The question is one of credibility.  The mere repetition of allegations from a source of dubious credibility does not render that source any more credible.  Absent some independent corroboration, there is no better reason to believe the complainant's account of extraneous misconduct that there is to believe his account of the misconduct for which the accused is on trial.  Simply put, an impeached complainant's own testimony as to other molestations, without more, is just as unreliable as rehabilitative evidence of the accused's lascivious intent and willingness to act on it as is his testimony regarding the charged offense.  It cannot therefore serve logically to rehabilitate him.  Because the only source of evidence of the extraneous misconduct in this cause was the impeached complainant himself, Michael, we hold it was not admissible to rehabilitate him, notwithstanding language in *Montgomery* and *Vernon*.

*Id.* at 903.  In response to *Pavlacka*, the Legislature enacted Article 38.37 of the Code of Criminal Procedure which applies in prosecutions of certain offenses against a child under seventeen years of age and makes admissible evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the charged offense, provided it is relevant to matters such as the state of the mind of the defendant and the child and the previous and subsequent relationship between the defendant and the child.  TEX.CODE CRIM.PROC.ANN. art. 38.37, §§ 1, 2 (West Supp. 2012).  Thus, a portion of *Pavlacka* has been legislatively overruled.  But the Court's holding that "testimony of other molestations coming from an impeached complainant cannot logically serve to rehabilitate that complainant" remains viable.  While the defense of fabrication was not at issue in *Pavlacka*, the Court's holding and underlying logic would apply with equal force in a case where fabrication has been raised.  We

conclude that the trial court abused its discretion by finding that Chip's testimony about the extraneous offense had relevance apart from character conformity.

*Harm Analysis*

The erroneous admission of an extraneous offense is non-constitutional error. *Johnson v. State*, 84 S.W.3d 726, 729 (Tex.App.--Houston [1st Dist.] 2002, pet. ref'd). Rule 44.2(b) of the Texas Rules of Appellate Procedure provides that any error, other than constitutional error, that does not affect substantial rights must be disregarded. TEX.R.APP.P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence on the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App. 1997). Substantial rights are not affected by the erroneous admission of evidence if, after examining the record as a whole, we have fair assurance that the error did not influence the jury, or had but a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex.Crim.App. 2002). In assessing the likelihood that the jury's decision was adversely affected by the error, the Court of Criminal Appeals has instructed that we consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case. *Id.* The reviewing court may also consider the jury instructions, the State's theory and any defensive theories, closing arguments, and even voir dire, if applicable. *Id.* at 355-56.

The State's case turned on the credibility of the complainant. As already discussed, the defense impeached Chip with his prior inconsistent statements and asserted that he fabricated the allegations due to the influence of his grandmother. Chip's younger brother, Michael, corroborated Chip by testifying that he witnessed two incidents where Appellant sexually assaulted Chip. Further, the State offered the testimony of a child forensic interviewer, Carrie

Paschall, who explained why children failed to report or delayed reporting abuse.

The character of the erroneously admitted evidence weighs in favor of a finding of harm. Extraneous-offense evidence is inherently prejudicial, tends to confuse the issues, and forces the accused to defend himself against charges not part of the present case against him. *Sims v. State*, 273 S.W.3d 291, 294-95 (Tex.Crim.App. 2008); *Higginbotham v. State*, 356 S.W.3d 584, 593 (Tex.App.--Texarkana 2011, pet. ref'd). An improperly admitted extraneous offense encourages a jury to base its decisions on character conformity, rather than evidence that the defendant committed the offense with which he or she has been charged. *Higginbotham*, 356 S.W.3d at 593.

In addition to considering the nature of the evidence, we must also consider its relationship to other evidence in the case. In addressing this factor, we consider to what degree the State emphasized the erroneously admitted evidence. *See Motilla*, 78 S.W.3d at 359. The presentation of the testimony about the extraneous offense consumed only a small amount of time. Chip's direct examination about the extraneous offense is found on eight pages of the reporter's record. The State's presentation of its case-in-chief on guilt-innocence, including objections and hearings conducted outside the presence of the jury, is comprised of approximately 478 pages of the reporter's record. Both prosecutors addressed the jury during closing argument but only one of them mentioned the extraneous offense and he focused the vast majority of his argument on the charged offenses.

White's denial that the extraneous offense occurred and his pointed testimony that Appellant had never engaged in any type of inappropriate touching or sexual contact with him certainly had the potential to significantly reduce the inherent prejudice of the extraneous offense evidence. This is especially true here because the trial court instructed the jury that it could not

consider the extraneous offense evidence unless it found beyond a reasonable doubt that Appellant committed the offense. Appellate courts generally presume that a jury followed the judge's instructions. *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex.Crim.App. 2009). After reviewing the entire record and considering the foregoing factors, we have a fair assurance that the error did not influence the jury or had but a slight effect. *See Higginbotham*, 356 S.W.3d at 593 (error in admission of extraneous offense evidence in prosecution for theft was harmless, despite fact that character of erroneously admitted evidence weighed in favor of finding of harm, where remaining factors overwhelmingly favored finding that error did not result in harm; the State's emphasis of extraneous offense was rather minimal, evidence consisted of twenty-one pages out of approximately 300 pages of testimony presented during guilt/innocence, testimony was confusing and contradictory, and trial court instructed jury that it could not consider extraneous offense unless the jury found beyond a reasonable doubt that the appellant had committed the offense). Having found that the error did not result in harm to Appellant's substantial rights, we overrule Issue One.

**EXPERT WITNESS QUALIFICATION**

In Issue Two, Appellant argues that Carrie Paschall, a child forensic interviewer, was not qualified to testify regarding "grooming" and "Child Abuse Accommodation Syndrome" because she is not qualified to testify as an expert in the field of psychology.

Texas Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Under Rule 702, the proponent of scientific evidence must show, by clear and convincing proof, that the evidence he is proffering is

sufficiently relevant and reliable to assist the jury in accurately understanding other evidence or in determining a fact in issue. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App. 2000). The reliability of "soft" science evidence may be established by showing that (1) the field of expertise involved is a legitimate one, (2) the subject matter of the expert's testimony is within the scope of that field, and (3) the expert's testimony properly relies upon or utilizes the principles involved in that field. *Id*. A trial court's ruling on the admissibility of scientific expert testimony is reviewed under an abuse of discretion standard. *Id.*

Paschall is a child forensic interviewer in the Crimes Against Children Unit of the Tarrant County District Attorney's Office. She has a bachelor's degree in political science and criminal justice. Prior to working as a child forensic interviewer, Paschall worked for four and one-half years as an investigator for Child Protective Services in a child sexual abuse unit and a specialized unit that handled child homicide and severe child abuse cases. She obtained her knowledge of "grooming" and Child Abuse Accommodation Syndrome through specialized training and study. At the time of trial, Paschall had conducted over 4,500 forensic interviews of children. Although Appellant characterizes Paschall's testimony as involving the field of psychology and argues that she is required to be qualified as an expert in that field, the Court of Criminal Appeals has recognized that grooming of children for sexual molestation, as a phenomenon, is a legitimate subject of expert testimony and grooming evidence has been received by courts from numerous types of experts, including psychiatrists, psychologists, therapists, and social workers. *Morris v. State*, 361 S.W.3d 649, 666 (Tex.Crim.App. 2011).[2] Further, the Court held that a law enforcement official with a significant amount of experience with child sex abuse cases may be qualified to testify about grooming. *Id.* Paschall's testimony established that she is qualified, by virtue of her training and experience, to testify about

---

[2] The Court of Criminal Appeals decided *Morris* after the parties filed their briefs in this case.

"grooming" Child Abuse Accommodation Syndrome is likewise a recognized phenomenon and has been held to be an appropriate subject for expert testimony. The Court of Criminal Appeals addressed the admissibility of expert testimony about this syndrome in *Duckett v. State*, 797 S.W.2d 906 (Tex.Crim.App. 1990), *overruled on other grounds, Cohn v. State*, 849 S.W.2d 817, 819 (Tex.Crim.App. 1993). According to *Duckett*, Dr. Roland Summit published an article entitled, "The Child Sexual Abuse Accommodation Syndrome" (CSAAS) in 1983. *Duckett*, 797 S.W.2d at 913 n.12, *citing* Summit, *The Child Sexual Abuse Accommodation Syndrome*, 7 CHILD ABUSE & NEGLECT 177 (1983). Dr. Summit described five characteristics commonly observed in child victims: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed, conflicted, and unconvincing disclosure, and (5) retraction. *Id.* The syndrome is not a diagnostic tool and is not probative of the fact of abuse but may be probative to explain a child's seemingly contradictory conduct after abuse has allegedly occurred. *Id.* CSAAS helps explain why many sexually abused children recant allegations of abuse and deny that anything occurred. *Id.* at 913. The expert witness who testified about CSAAS in *Duckett* was not a psychologist or psychiatrist but was a certified social worker and advanced clinical practitioner who also held a certificate as an instructor with the Texas Commission on Law Enforcement Officer's Standards and Education in the area of child sexual abuse investigation. *See id.* at 908. We conclude that Paschall, because of her training and significant experience with child sex abuse cases, is qualified to testify about CSAAS. *See Morris*, 361 S.W.3d at 666. Finding no abuse of discretion, we overrule Issue Two.

## CLOSING ARGUMENT

In his final issue, Appellant contends that the trial court erred by "suppressing" his attorney's closing argument. One of Appellant's theories during trial was that Chip's

grandmother disliked Appellant and repeatedly called CPS because he is African-American. On the first day of trial, Tamera testified that her mother did not want her or the children around Appellant because he is African-American. The following exchange occurred during closing argument when defense counsel was addressing why CPS did not place the children with the grandmother when they were removed from Appellant's home:

> [Defense counsel]: I submit to you that they didn't place them right away with the grandmother because she was a racist, because she was a bigot.
>
> [The prosecutor]: Objection, Your Honor. That is nonsupported [sic] by the facts, and it's improper argument.
>
> [The trial court]: Ladies and gentlemen, you're the fact finders. You will remember and recall the testimony as you previously heard it. Please remember that the argument of Counsel is to aid you in your deliberation, if any, but what they say is not evidence.

The trial court did not sustain the State's objection either expressly or impliedly, it did not instruct the jury to disregard defense counsel's argument, and it did not prohibit counsel from continuing with the argument. Even if the trial court had sustained the State's objection, that ruling would not have been erroneous because there is no evidence that CPS did not place the children with the grandmother because she is a racist. Argument that interjects facts not supported by the record is improper. *See Brown v. State*, 270 S.W.3d 564, 570 (Tex.Crim.App. 2008). Issue Three is overruled. Having overruled each issue, we affirm the judgment of the trial court.

September 26, 2012

_____
ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.

(Do Not Publish)